## Cresson's Appeal.

1. A bill for an account filed by the widow of a deceased partner against the surviving partner of a firm, after setting forth a former partnership deed and its terms, averred that in the year 1867 the said partners commenced the jewelry business, investing therein $12,000 of the funds of said partnership, and carried on the same, in like manner as the said former business until the death of the deceased partner. The defendant in his answer averred that there were no funds of said partnership to invest in the jewelry business; that the purchase was made by the assignment of a bond and mortgage belonging to defendant's brother, the deceased partner; that they agreed to enter into the partnership in the jewelry business, and as the deceased was blind and could not give any personal attention to the business, it was agreed that defendant should receive for his services thirty dollars per week, and that the profits, after the payment of all expenses, including said salary, should be equally divided; that said salary had been regularly drawn and no profits were ever taken out of the business by either partner. In a subsequent paragraph of the answer, the defendant further averred, "I deny that I never accounted to the deceased for the assets of the partnership aforesaid. He was thoroughly well aware of the disposition and appropriation that were made of the receipts of the sale of the former business and property and approved of the same. He was also aware that I was drawing $30 per week as compensation for my services as manager of the jewelry business, in addition to my share of the profits, and approved of my doing so." *Held*, that the answer was responsive to the bill.

[Cresson's Appeal.]

2. The court below held that the second paragraph of the answer was guilty of duplicity, inasmuch as it was an averment of a subsequent license not part of the original contract, but something subsequently alleged in avoidance of liability, and therefore not responsive to the bill. *Held*, that this was error.

3. Eaton's Appeal, 16 P. F. Smith 490, reviewed and followed.

June 20th 1879.    Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY and STERRETT, JJ.    WOODWARD, J., absent.

Appeal from the Court of Common Pleas of *Montgomery county :* Of January Term 1877, No. 169.    In Equity.    Certified from the Eastern District.

Appeal of Walter Cresson from the decree of the court confirming the report of the master in certain proceedings for a partnership account, wherein Ann R. Cresson, administratrix of the estate of William Cresson, deceased, filed a bill in equity against said Walter Cresson.

Ann R. Cresson filed a bill in equity, which set forth that from 1850 to 1865, Walter Cresson, and the said William Cresson, had been copartners in the saw-manufacturing business in Conshohocken. That the said William, though blind, yet rendered efficient personal services therein; that the books and papers were in the possession and control of Walter, who received and appropriated all the funds of the business; that the firm name was Walter Cresson; that in 1865 the saw-manufacturing business was discontinued, and the factory and certain dwelling-houses sold for $24,000; afterwards other real estate was sold for $3750, and certain machinery for about $2000, all of which belonged to the two partners, and all of which moneys were received by the said Walter Cresson in various payments, some as late as the year 1873.

That in the year 1867, the said partners commenced the jewelry business in Philadelphia, and invested therein the sum of $12,000 of the funds of the partnership, and carried on the same in like manner as the former business, until the death of William Cresson. That the said Walter Cresson had the management of all the assets, sales, receipts and moneys of the said partnership during the whole time of its existence, and had never accounted therefor, either in the lifetime of the said William Cresson, or to his administratrix, since his death, and praying for an account of said partnership and a decree directing him to pay the plaintiff whatever should, on such account, be found due by him.

This bill was filed Nov. 16th 1874.    On the 14th of January 1875, the defendant pleaded the Statute of Limitations to so much of the bill as sought to compel him to account for the dealings of the partnership in the saw manufacturing business under the firm of Walter Cresson, and of the disposition of the $2000, or thereabouts, received for the sale of the machinery, and of so much of the $24,000, the consideration for the sale of the real estate sold

in 1865, as were not a portion of the mortgage of $12,000 given for part of the purchase-money.

To the remainder of said bill defendant answered that in October 1867, he entered into copartnership with his brother in the jewelry business. That they invested therein $12,000; not, however, of the funds of said partnership, but of certain real estate, stocks and bonds of which they were joint owners, and all of which stood in his name, a detailed account of which was given. That in 1865 he sold certain machinery to Disston for about $2000, and certain real estate for $24,000, of which $6000 was cash, $6000 payable in one year, and the balance, $12,000, payable after a term of years, and secured by mortgage on the premises. These moneys were by him invested in stocks and bonds, some of which were again sold, and debts of the partners paid.

That in 1867 he purchased the stock in trade of the jewelry business of one Fries, assigning to him the $12,000 mortgage belonging to his brother and himself, and thenceforth entered into this business under the firm name of J. B. Powell & Co. at first, but afterwards as Walter Cresson. That as William Cresson was blind, and could give no personal attention to the business, it was agreed that the defendant should receive $30 per week for his services, and that the profits remaining after payment of expenses, including said payment to himself, should be equally divided; alleging that the said salary had been regularly drawn by him; that neither of the partners had ever drawn any sums on account of profits out of the jewelry business; that they had been obliged to contribute $7698.91 of their joint means to said business over the amount originally invested. That in 1871 he had sold some more real estate for $1000, paid May 15th 1871, and $2795.79, paid 26th August 1873, which with about $231.18 received for old material sold, were used in the payment of debts due by himself and brother.

He further admitted that he carried on said jewelry business after the death of his copartner up to the 6th of October 1874, when an appraisement was made of the remaining stock and fixtures by appraisers agreed upon. From the appraisement made, he claimed a deduction of $1500 on account of the lease, and that all the debts of the concern were not paid. He also claimed a credit for certain sums paid William Cresson in the years from 1868 to 1874 of $4284.77. He admitted that there had never been a settlement of the accounts of the saw-manufacturing business, and alleged that his brother knew that the whole assets of the concern had been invested in the stocks and bonds stated, and there was nothing to account for these except his share of those investments and the jewelry business, of which he agreed he was to account; that the books thereof had been submitted to an expert, and that the plaintiff was fully advised of the accounts of said business.

He further answered that William Cresson was fully aware of all the acts done, investments made, and of the drawing by him, the said defendant, of $30 per week for his services, and approved of the same. That there was nothing due on the saw-manufacturing business. That plaintiff was entitled to half the stocks, bonds, &c., and to what would be the balance of the jewelry business in settlement after allowing his claim as aforesaid. That he believed there was nothing due on the accounts of interest or rents received.

To this a replication was filed February 19th 1875, and a master appointed, who in substance found the following facts: From the year 1850 to 1865 William Cresson and Walter Cresson were partners in the business of manufacturing saws in Conshohocken, under the firm name of Walter Cresson, in whose name also was held all the real estate belonging to the two brothers. He conducted the business and had sole charge of the same, William Cresson being blind. In 1865 this business ceased, and during that year and the year 1866 Walter Cresson received from the sale of the saw factory, &c., about $27,000, which he invested in various securities, among which was a $12,000 mortgage. In October 1867, Walter Cresson purchased the stock in trade of a jewelry business of one Fries, and made use of the $12,000 mortgage to make the purchase. He and William then carried on the jewelry business under the name of Walter Cresson, until it was dissolved by the death of William, February 24th 1874. The capital originally invested in the jewelry business was $12,000. To this were added subsequently various sums, amounting in the aggregate to the sum of $7658.91 (from which $362.42 were afterwards withdrawn), which were derived from the sales of other real estate made in 1871, and from the sales of some of the stocks before mentioned. The whole capital then in the jewelry business was $19,296.49. Walter Cresson kept the books of the concern. Among the entries in these books the firm is charged each week with a sum of money as paid to Walter Cresson. Aggregating these sums they are found to amount to $30 each week. For a large part of the time the entries are exactly $30 each week. There is nothing on the books to show what these entries are meant for; but they appear just like all the other entries of expenses charged; they amount in all to $11,093.10. No settlement of any kind was ever made of the partnership. The books were never examined by William Cresson nor by any one on his behalf in his lifetime. There was no agreement between the partners so far as disclosed by the testimony.

Walter Cresson claimed that $30 per week was the compensation or salary he was to receive for his services in conducting the business. He gave his whole attention to the business. William Cresson gave it no attention and rendered no services in it. Both William and Walter resided at Conshohocken; William visited the

store but seldom, and when he did go there, it was for the purpose of drawing money. There existed implicit confidence on his part in Walter, and their relations were those of entire friendliness. After the death of William Cresson, the books and accounts of the firm were placed in the hands of an accountant.

On the 6th October 1874, an appraisement of the stock and fixtures of the jewelry business was made by certain persons chosen for that purpose. The value thereof returned by these appraisers was $7725.61. They also recommended a reduction for the assumption of the lease by Walter of $1500, and this the plaintiff conceded. In 1867, Walter Cresson bought $7000 additional bonds of the Susquehanna Canal Company, with funds of the partners or on joint account, thus making $13,000 in all. After William's death he sold $5000 of these bonds. These were sold at 73. The balance, to wit, $8000, he claimed to account for at the same price, by either paying or assuming upon himself certain debts due by the partners. At the time of the hearing these bonds were worth about 75. He has paid one debt of $1000, another of $800, and produced a release from a $4000 creditor discharging the estate of William Cresson.

In reporting upon the allowance of $30 per week to Walter Cresson, for services, the master, inter alia, said :

" There is nothing here which refers to the terms or conditions on which the business was carried on, or the interests which the partners had therein. To be responsive to the bill the answer must reply to something specifically alleged or charged. In this case the first we know of the terms of the saw-manufacturing copartnership is the admission of the defendant, to wit, that the partners there were equal. It will not do for the defendant by an admission of a fact, or by making an allegation to place himself in the position he might occupy had the bill contained an assertion of that fact or made that allegation. The allegation of the bill that the jewelry business was carried on in like manner as the saw-manufacturing business did not refer to the terms of the copartnership, or to the respective interest therein, but to the partnership itself, and the answer setting up a compensation to Walter Cresson was not responsive, and cannot be received. Nor is the answer responsive as showing an account or appropriation of the assets of the firm to the extent of $30 per week. The bill asks for an account, but an answer showing an appropriation of the firm assets to the payment of a salary to one member of the firm is not an account of the copartnership.

" But it is said that as the law, in the absence of an agreement of partnership, implies that the partners are equal, an answer denying this equality and stating the terms of the partnership is responsive to the bill. But this argument loses sight of the law under which the answer may, in certain cases, be evidence. As before remarked,

in order to be evidence the answer must be responsive to a fact alleged or allegation made in the bill. An answer to an implication which the law raises would not be a reply to any fact or allegation in the bill." The master therefore excluded the charge for salary.

Exceptions were filed to this report and after argument, the court, Ross, P. J., in ruling upon these exceptions, in an opinion, inter alia, said:

"The next question which presents itself is of the greatest moment to the contending parties. It involves the claim of the defendant to extra compensation, at the rate of $30 per week, during the continuance of the partnership in the jewelry business. It is true beyond all question, that each partner is bound to give his services to the firm without extra compensation, unless there be an express agreement to pay him for his services. This is well settled by authority: Story on Partnership, § 182. This being true, the next question is whether such an agreement existed in this copartnership. To determine this, we must ascertain the terms upon which this firm was established. There were no written articles. All the stipulations and agreements, therefore, are to be grathered from the evidence.

"It is earnestly contended that the fact is proved by the answer, which avers that it was understood and agreed that $30 was to be allowed to defendant as extra compensation per week. It is insisted that the answer is responsive to the bill, and that being so it has the weight of two witnesses. To sustain this position, Eaton's Appeal, 16 P. F. Smith 483, is cited. This case was properly ruled upon the pleadings, and the point decided is fully sustained by the English and American cases; and I feel bound to follow it. It is due to the learned and accurate master to say, that Eaton's Appeal was cited to him; and I am without the aid of his views and analysis. Yet acting with the best light I can derive from the authorities, I am reluctantly constrained to receive the answer of the defendant as responsive to the bill in this particular. I agree with the conclusions of the master as to amounts. I think the account he has stated equitable and just between the parties and most merciful to the defendant, whose varying attitudes are not suggestive of the highest rectitude in his dealings with his brother's widow. But it is not for this court to disregard the rulings of the court of last resort; and after a careful and even anxious effort to discriminate this case from Eaton's Appeal and the other cases cited by it or lying in its track, I have failed to be successful.

"To determine the question it is necessary to analyze the averments in the bill. The first parargraph avers, that the defendant and plaintiff's intestate were associated together as 'partners in business' for many years, until the death of the latter, on the 14th of February 1874. The second avers, 'that the said partners

from about the year 1850, until the year 1865, carried on the business of manufacturing saws in the borough of Conshohocken.' The third alleges, that the decedent was blind, 'but nevertheless took an active part in the said partnership business, and was able to render and did render, by his skill and judgment therein, efficient personal services,' &c. The sixth paragraph avers, 'that in the year 1867, the parties commenced the jewelry business in the city of Philadelphia, investing therein $12,000 of the funds of the said partnership, and carried the same on in like manner as the said former business, till the decease of the said William Cresson, as aforesaid.'

"In paragraph first of plaintiff's answer, which seems to apply to the first six paragraphs of plaintiff's bill, it is averred: 'We then agreed to enter into a partnership for carrying on said business (jewelry), at first as J. B. Powell & Co., and afterwards under the firm name of Walter Cresson. As William was blind, and could not give any personal attention to the business, it was agreed that I should receive for my services $30 per week, and that the profits remaining after payment of all expenses, including the said payment to myself, should be equally divided. Such salary has been regularly drawn by me.' In the seventh paragraph of the answer it is further averred: 'He was also aware that I was drawing $30 per week, as compensation for my services as manager of the jewelry business, in addition to my share of the profits, and approved of my so doing.'

"I have said that the first of the answers is responsive; a partnership is averred. It is averred to have been carried on in like manner as a former business, and it was competent for the defendant to state any difference, and if so, what that difference was.

"The rule laid down in Eaton's Appeal and elaborated in the opinion of Mr. Justice SHARSWOOD, is simply that 'whatever constitutes in truth a part of the facts stated in the bill, the defendant has a right and is indeed bound to set out.' It is equally true, however, as stated by the learned judge in this connection: 'But he cannot make himself a witness for himself generally and introduce other (independent?) facts either in avoidance or defence. It is considered indeed as a test whether as a witness on examination he could be cross-examined as to the matter which he states in anticipation of his defence on a trial at law:' Hoffman Ch. Rep. 185. Now whether this rule be unwise or wise (I refer to this testing criterion) it is the test adopted by our court of last resort, and we are bound to follow it; after all, the doctrine of *stare decisis* is the only safe rule for courts, especially those of inferior jurisdiction. But before adopting this as the controlling test, I have patiently examined the authorities, and I think the rule is sustained by unquestioned authority, though so broad an application of it has never been made until Eaton's Appeal in this state.

Its first trace appears in Amb. 589. In 7 Ves. 404, Ld. Eldon ruled what was not responsive, and in so doing declared what would be so considered. The same thing is true in Thompson v. Lambe, 7 Ves. 587, in which the first case is cited and the same doctrine declared. In 19 Vesey 582, the same doctrine is declared, where the answer was held to be only responsive in part, and the residue being rejected as in confession and avoidance. This is a case of great hardship to the defendant, but Sir William Grant, the Master of the Rolls, draws the line with a steady hand. Other English and American cases might be cited, but they are fully quoted in the principal case (Eaton's Appeal).

" The first trace of this reasoning in our own reports I find in Commonwealth v. Cullen, 1 Harris 143, citing 9 Cranch 160; Clark's Ex'rs v. Ramsdyk, 2 Johnson's Ch. Rep. 90; Hart v. Ten Eyck. It next appears in Eberly v. Groff, 9 Harris 256, citing, in addition, Story's Equity Pr., sect. 849, a; 2 Dan'l. Ch. Pr. 10, 19; 1 Howard's Sup. Ct. Rep. 134. This case is badly reported, but it seems from the opinion of the court that the answer was in direct response to the bill. Pusey v. Wright et al., 7 Casey 394, is a strong case, fairly sustaining the ruling and test adopted by Eaton's Appeal. The pleadings in the case are, when carefully read, excellent exhibitions of when an answer may be deemed responsive to the bill. Following the ruling of Chief Justice Parker in Bellows v. Stone, 18 N. H. 465, adopted in Eaton's Appeal, the late Chief Justice THOMPSON declares : " If a contract be set forth and the defendant be called upon to answer it, a denial that it exists, *modo et forma*, would not be good according to chancery practice; for this is subject to the implication that it existed in some other form. To avoid this, the defendant must state how it existed, and wherein it had no existence. This would be a good traverse :' 2 Dan'l Ch. Pr. 259 ; 3 Greenleaf on Ev., sect. 285.

" Apply the law thus hastily reviewed, for I have not paused to analyze in this opinion many of the cases I have either cited or examined in its preparation, and the conclusion is inevitable. There is an averment of a partnership carried on as the saw-manufacturing business. A simple denial of this would not be a sufficient answer. The defendant must state how it was carried on; how it differed from the former partnership. He must state how it existed and wherein it had no existence. This he does, and the answer is therefore responsive.

" Again, suppose a partnership simply had been averred in the bill : clearly it would be competent for the defendant to admit it, give its terms, whether it was general or limited, when formed, and what were its conditions, for how long it was to continue, and the arrangements for its dissolution and settlement. Under the authorities this cannot, I think be doubted; and if the test as to cross-examination be adopted, it cannot be successfully questioned.

[Cresson's Appeal.]

Certainly the common-law rule as to what is a proper cross-examination would admit all this, after the existence of a partnership had been established by a witness in chief.

"The answer as to the extra compensation is therefore ruled to be responsive, but this is not decisive of this branch of the case, for the answer upon this point is guilty of duplicity.

"In paragraph first of the answer, an agreement as part of the original contract of compensation is averred. This, as has been seen, is responsive, because part of the contract. But in paragraph seven of the answer, it is alleged that the decedent ' was also aware that I was drawing $30 per week as compensation for my services as manager in the jewelry business, in addition to my share of the profits, and approved of my doing so.' This is a mere averment of a subsequent license, and not being part of the original contract but something subsequently alleged in avoidance of liability, is not responsive. Now which is true? If the former the answer must prevail. If the latter the master was right. Upon the proof as it stands, a chancellor cannot say. An answer possessing the weight which the practice in the equitable forum gives it is to be strictly construed. Where conflicting, contradictory, or evasive, it loses its force. In the last case upon the subject, Smith *v.* Spencer, Newbold's Appeal, 2 Weekly Notes of Cases 472, it was ruled ' that where a party was permitted to testify, and does testify in compliance with his answer, it will not do to hold that his testimony shall be disregarded and his answer stand wholly unimpeached.'

"It would seem to be equally true that where a party is not permitted to testify as in this case, and his answer conflicts, so that one statement of facts is responsive, and another representation of the same facts contradicts it and is not responsive, the answer so far as it is contradictory ought not to prevail with the force of two witnesses. The case is anomalous; and I have determined to refer the case again to the master to determine which of the conflicting statements is the truth."

The master filed a subsequent report, and concluded, saying: "I cannot find that there was any agreement between the partners by which the compensation claimed could be established; nor can I find that any license was ever given by William Cresson authorizing the defendant to draw the money claimed."

The material facts on which the master based these conclusions will be found in the opinion of this court. The court then confirmed both the original and supplemental report, and made a decree accordingly. From this decree defendant took this appeal, and, inter alia, alleged that the court erred:

4. In overruling the plea of the Statute of Limitations to all claims for interest collected by defendant at a period more than six years before filing of bill.

[Cresson's Appeal.]

8. In confirming so much of the master's report as surcharged the defendant with $11,093.10, drawn out by him as compensation for carrying on the jewelry business, at the rate of $30 per week, from its commencement until its ending by the death of William Cresson.

9. In deciding that the answer was conflicting in its statement of the terms of the partnership.

*John G. Johnson*, for appellant.—Did not the answers directly respond to the averments of the bill? We do not contend that matter set up by way of confession and avoidance, can be held responsive; but simply that which is necessary to be stated, in full reply to what has been charged. It is the duty of the defendant, under the equity rules, to answer, not by a simple yes or no, but fully. The bill charged that the jewellery business was carried on "in a similar manner" to that of the saw-manufacturing, which had been conducted upon the terms of an equal division of the receipts. This was an averment as to the terms of the new partnership, and compelled the appellant to set up what they really were. If he had been silent, he would have admitted that the agreement was correctly averred in the bill. The law implies, from the fact of a contract to enter into a partnership, that there was an agreement that nothing should be received by either partner, as compensation for his services. In averring that a partnership was entered into, the complainant averred all that was therein implied, and it was the appellant's duty to answer her, and to set up what the terms actually were: Hart *v.* Ten Eyck, 2 Johns. Ch. 89; Eberly *v.* Groff, 9 Harris 256; Schwarz *v.* Wendell, 1 Walker's Ch. (Mich.) 267; Cooper *v.* Tappan, 9 Wisc. 361; Eaton's Appeal, 16 P. F. Smith 490.

The averment in the seventh section of the answer was simply that the main disbursements of the money had been made known to and approved of by William Cresson. Was it no response to the bill to say that $11,000 had been accounted for in this way? Did it lessen the force of the averment to say that this had been approved of? It appeared, by this response, that in addition to the contemporaneous agreement, it was known to the decedent until his death, that it was being acted upon, and that he approved of such contract, acting thereunder. There is not in this any inconsistency or contradiction of the former averment of a contemporaneous agreement.

The matter was not affected by the testimony of Powell, taken under the second reference to the master.

*B. M. Boyer*, for appellee.—If, indeed, the bill had set forth the terms of the partnership, and had called upon the defendant to answer on that point, this case might fall within the scope of the

10 Norris—12

decision in Eaton's Appeal, 16 P. F. Smith 483. But nowhere in this bill are the terms of the original copartnership defined.

The defendant was not called upon to answer as to the conditions of the partnership, nor as to salary, but simply to account. The manner of carrying on a business does not necessarily include the terms of copartnership. The business may be "carried on" in a manner inconsistent with the articles of copartnership, and in no wise disclosing them. In the absence of written articles of copartnership what, in such a case, is to limit the latitude of the defendant's averments? An affirmative fact, averred by the answer in avoidance of the averments in the bill, must be proved like any other affirmative averment in pleading: 2 Story's Equity, sect. 1529; 2 Johns. Chan. 88–90; Vint *v.* Heirs of King, 2 Am. L. Reg. 747; Naglee's Estate, 2 P. F. Smith 160; Pusey et al. *v.* Wright et al., 7 Casey 389.

The presumption of the law is against the allowance of any salary for the services of a partner, and the averment of an exceptional agreement in this regard must be clearly established by evidence: Story on Partnership, sects. 182, 185; Parsons on Partnership 229. Assuming that the averment as to salary was responsive to the bill, it was contradicted and overthrown by the evidence.

Mr. Justice PAXSON delivered the opinion of the court, October 6th 1879.

This was a bill for an account filed against the surviving partner by the widow and administratrix of the deceased partner. The parties were two brothers, Walter Cresson, the appellant, and William Cresson, now deceased. From about the year 1850 until 1865, they carried on the business of manufacturing saws at Conshohocken, Montgomery county. This business was discontinued, and about the year 1867, they commenced the jewelry business in the city of Philadelphia. In both places it appears to have been carried on in the name of Walter Cresson. William was blind, and while he paid some attention to the business at Conshohocken, he gave it none whatever in Philadelphia. His visits to the jewelry store were infrequent. The most perfect confidence appears to have existed between the brothers. Walter kept the books, and William evidently had little, if any, knowledge of their contents.

The main contention was whether Walter was entitled, upon the adjustment of their partnership accounts, to a credit of $30 per week as compensation over and above any share of the profits, for his services in attending to the jewelry business. This question is raised by the pleadings. There appears no written evidence of the partnership or of the terms upon which it was entered into. The bill, after setting forth the partnership in Conshohocken and

its termination, avers: "That in the year 1867 the said partners commenced the jewellery business in the city of Philadelphia, investing therein $12,000 of the funds of said partnership, and carried the same on, in like manner as the said former business, till the decease of the said William Cresson as aforesaid." To this general allegation of a partnership the appellant answered: "There were no 'funds of said partnership' to be invested in the said jewelry business, for all were exhausted· in the purchases aforesaid. In October 1867, at the request of my brother, and with his approval, I purchased the stock in trade, &c., of the jewelry business, which had been carried on by one John Fries, by assigning to him the bond and mortgage of Joseph Lea & Co., for $12,000, belonging to my brother and myself. We then agreed to enter into a partnership for carrying on said business, at first as J. B. Powell & Co., and afterwards under the. firm name of Walter Cresson. As William was blind and could not give any personal attention to the business, it was agreed that I should receive for my services $30 per week, and that the profits remaining after the payment of all expenses, including the said payment to myself, should be equally divided. Said salary has been regularly drawn by me. Neither my brother nor I have ever drawn out of the business any sums on account of profits." In a subsequent paragraph (7) the defendant further answered: "I deny that I never accounted to William Cresson for the assets of the partnerships aforesaid. He was 'thoroughly well aware of the disposition and appropriation that was made of the receipts of the sale of the saw-manufacturing business and property, and approved of such disposition and appropriation. He was also aware that I was drawing $30 per week as compensation for my services as manager of the jewelry business, in addition to my share of the profits, and approved of my doing so." And in a supplemental answer the defendant further said: "The agreement between my brother William and myself, by which I was to receive out of the partnership fund before division of profits and losses, the sum of $30 per week as compensation for my services, was contemporaneous with the commencement of the partnership and its operations. My allusion in my answer to my brother's approval of my drawing of that sum per week was merely to state that in the explanation of our affairs, which from time to time I gave, the deduction of that sum was known and approved by him. I did not mean that such approval was by way of any new agreement, for the agreement was made, as I have stated, at the begining of the partnership operations in the jewelry business."

The learned master held that the answer was not responsive to the bill; that inasmuch as the bill averred a partnership, without setting out its terms, so much of the answer as sets up the agreement that Walter was to receive a compensation for his services was the assertion of a right affirmatively, in opposition to the plain-

tiff's demand, and that the defendant was as much bound to assert it by indifferent testimony as the plaintiff was to sustain his bill. This is the turning point of the case. If the answer is responsive, it must stand until overthrown by the testimony of two witnesses, or of one witness with corroborating circumstances. The court below reversed the master upon this point, and held the answer to be responsive. In this the learned judge was right. The case comes within the principle of Eaton's Appeal, 16 P. F. Smith 483, where this subject was fully discussed, by the present chief justice, and the authorities referred to. It was attempted, however, to distinguish this case from Eaton's Appeal, upon the ground that in the latter the interest of the parties in the partnership was set forth in the bill, and that therefore an averment in the answer of one of the defendants, that he had four-ninths interest instead of three-ninths, as alleged by plaintiffs, was responsive. This is a distinction without a difference. In Eaton's Appeal the bill charged a partnership between three, and that their interests were equal. Here the bill avers generally a partnership between two. The effect of this averment, if established, is to make them equal partners, for the law presumes that a partnership is for the equal benefit of all concerned, until the contrary appears. So that the legal effect of the bill is the same as if it had charged that the partners were to share the profits equally. Under such circumstances it would be an inequitable rule that would prevent the defendants denying the equality of the partnership, and yet compel him to admit the partnership itself.

While the learned judge held the answer to be responsive, he also ruled that it was guilty of duplicity, because of that portion of paragraph 7, which avers, that the decedent " was also aware that I was drawing $30 per week, as compensation for my services as manager in the jewelry business, in addition to my share of the profits, and approved of my doing so;" that this is an averment of a subsequent license, not part of the original contract, but something subsequently alleged in avoidance of liability, and therefore not responsive. In this the learned judge fell into error. The answer avers with sufficient distinctness that the agreement for the additional compensation was a part of the original·contract of partnership. If any doubt existed upon this point it is removed by the supplemental answer which asserts it unequivocally. If then the agreement for compensation was a part of the original contract, the averment in the answer that the defendant had, from the day of its formation, drawn the amount thereof with the knowledge and approval of the plaintiff, furnishes no room for the allegation that it was setting up a subsequent license to draw the $30 per week; a new contract inconsistent with that already alleged. It is not duplicity to allege that the contract for compensation set up in the answer had been carried out by the parties.

The answer being responsive and not open to the charge of duplicity, was there sufficient testimony in the case to overcome it?    That is to say, was there the testimony of two witnesses for the plaintiff upon this point, or the testimony of one witness with corroborating circumstances?    The master concedes there is no countervailing testimony as to the agreement for compensation, and that it would be conclusive upon the point were the answer entirely consistent. I quote from his report: " But inasmuch as the answer, while averring an agreement, also avers a license or permission on the part of the now deceased partner, by which the compensation in question was drawn by the defendant in this case, the whole matter has been referred back in order to determine which of these conflicting statements is correct."    The master thereupon proceeded to consider the case and took some additional testimony.    As a result he finds that the answer is overcome by the other proofs in the case, and his finding was confirmed by the court below.    Herein was error. The finding of the master was without testimony to support it. His report admits, as before stated, that there is " no countervailing testimony as to the agreement for compensation."    His conclusions are merely deductions from certain facts in the cause, and whether accurate or not, lack the essential aid of another witness.    The facts to which the master refers might, in case his deductions from them are correct, be valuable as corroborating circumstances, but as independent proof they are not sufficient.    The master deduces his opinion that there was no agreement for compensation as set forth in the answer, from the following: 1. That Walter Cresson was entirely ignorant of the jewelry business, and that as a practical man had to be employed, Walter's services could not have been worth the large sum demanded for them.    2.  That the knowledge of William Cresson's membership in the firm, and of said alleged agreement between the brothers, was withheld from Mr. Powell, who appears to have been interested in the business for a short period at its commencement; and 3. That Walter Cresson had given instructions to Powell to withhold from William any knowledge of the business in case he asked about it.    " These facts," says the master, " together with the inconsistency of the answer which has been already referred to, force the conclusion that there was no such agreement ever made as that averred in the answer."    Had the existence of the agreement been denied by a competent witness, the matters upon which the master relies might, if his deductions from the facts are sound, have been sufficient to overcome the answer.    But no witness has said there was not such an agreement.    That Mr. Powell did not know of it is no more remarkable than is the fact that he did not know that Walter and William were partners.

We are of opinion that the court below erred in confirming so much of the master's report as surcharged the defendant with

$11,093 drawn out by him as compensation for carrying on the jewelry business, at the rate of $30 per week from its commencement till its .ending by the death of William Cresson. This disposes of all that needs discussion in the case. The learned judge properly applied the Statute of Limitations, and his ruling upon other points are free from error.

The decree is reversed at the costs of the appellee, and it is ordered that the record be remitted for further proceedings.